## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **DIERTRA A. PITTS,** | * | |
| *Plaintiff,* | * | |
| v. | * | Civil Case No. 1:22-CV-01404-JMC |
| **BALTIMORE POLICE DEPARTMENT,** | * | |
| *Defendant.* | * | |
| | * | |

\* \* \* \* \* \* \*

### <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiff, Diertra A. Pitts, filed this employment discrimination action against Defendant, Baltimore Police Department ("Defendant" or "BPD"), on June 8, 2022, alleging retaliation and hostile work environment in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e *et seq.*, retaliation under 42 U.S.C. § 1983, and retaliation in violation of the Maryland Fair Employment Practices Act ("MFEPA"), Md. Code Ann., State Gov't, § 20-601 *et seq.* (Compl., ECF No. 1). Judge Bennett, who previously presided over this case, granted in part and denied in part Defendant's subsequent Motion to Dismiss Plaintiff's Complaint on April 28, 2023. *Pitts v. Balt. Police Dep't*, No. RDB-22-1404, 2023 WL 3158705, at *10 (D. Md. Apr. 28, 2023). Specifically, Judge Bennett dismissed Pitts' retaliation claims under Title VII, 42 U.S.C. § 1983, and the MFEPA, but permitted her hostile work environment claim to proceed to discovery. *Id.* Presently before the Court is Defendant's Motion for Summary Judgment. (Def.'s Mot. Summ. J., ECF No. 50). The Motion has been fully briefed, (Pl.'s Opp'n to Def.'s Mot. Summ. J., ECF No. 69; Def.'s Reply, ECF No. 77), and no hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2023). For the reasons that follow, Defendant's motion will be GRANTED**.**

# I.    BACKGROUND

### a.    Factual Background

Pitts is an African American woman formerly employed by BPD. Pitts was hired by BPD on March 20, 1987, and eventually reached the rank of Detective Sergeant. (Def.'s Mot. Summ. J. Ex. 1, at 10, 14, ECF No. 50-2).[1] She began working for BPD's EEO unit in 2010,[2] where she was responsible for investigating claims of discrimination within BPD and supervising detectives who performed their own investigations. *Id.* at 19. At the time that Pitts was hired to the EEO Office in 2010, she reported to Lieutenant Mike Norris ("Norris"), who in turn reported to Acting Deputy Major Keith Matthews ("Matthews"). *Id.* at 14. Deputy Major Matthews reported directly to the Police Commissioner, Fred Bealefeld. *Id.* at 13-14. Anthony Batts became the BPD Police Commissioner in the fall of 2012, and served in that position until approximately July 8, 2015. (Def.'s Mot. Summ. J. Ex. 18, at 1, ECF No. 50-19).

#### i.    January 23, 2014 EEOC Charge

Pitts alleges that "a lot of things changed when [Commissioner Batts] arrived" in 2012. (Def.'s Mot. Summ. J. Ex. 1, at 16, ECF No. 50-2). She contends that at some point after Commissioner Batts replaced Commissioner Bealefeld, there were two instances in which she was directed to change "guilty" EEO complaint findings to "not guilty." *Id.* at 16-29.[3] Pitts alleges that

---

[1] When the Court cites to a specific page number or range of page numbers, the Court is referring to the page numbers provided in the electronic filing stamps located at the top of every electronically filed document.

[2] Neither party defines the EEO acronym in their filings, but according to the Baltimore Police Department's current organizational chart, there is an "Equal Opportunity and Diversity Section" which appears to align with the EEO acronym most closely. Baltimore Police Department, *About the Department Organizational Chart*, https://www.baltimorepolice.org/about/about-department/organizational-chart (last visited Dec. 12, 2024). Given that Pitts' position with the EEO began in 2010, it is possible that it no longer exists under the current organizational chart.

[3] The Court notes that almost all of the facts referenced in the Factual Background section of this opinion are characterized by Defendant as undisputed, and Defendant titles its factual recitation section of it Motion for Summary Judgment brief "Statement of Undisputed Facts." (Def.'s Mem. Supp. Summ. J. at 7, ECF No. 50-1). It appears that Defendant does actually dispute many of these facts. For example, although Defendant includes Plaintiff's allegation that Commissioner Batts directed Norris and Matthews to order her to change a finding from "guilty" to "not guilty" in the "Statement of Undisputed Facts," Defendant also attaches a declaration from Commissioner Batts denying that he ever directed such an order. (Def.'s Mot. Summ. J. Ex. 18, ECF No. 50-19).

in the first incident, Commissioner Batts advised Norris and Matthews to instruct Pitts to change a complaint finding against Deputy Major Rutherford to "not guilty" because Batts "was upset about Sergeants and Detectives investigating Command Staff." *Id.*; Pl.'s Opp'n to Def.'s Mot. Summ. J., Ex. 2, at 4, ECF No. 69-5. Pitts initially refused to change the finding, "[a]t which time Acting Major Matthews and Lt. M. Norris advised [her] that if she didn't change it, they would let it sit on their desk until it expired," essentially voiding the case. *Id.* Pitts changed the finding on the coversheet, which was signed by Norris and Matthews, but left the investigation casebook otherwise intact and "discretely advised the complainant to file a complaint with the Federal EEOC[.]" *Id.* According to Pitts, the EEOC "did sustain" the complainant's allegations. *Id.* Pitts asserts that after this interaction "the harassment, retaliation and hostile work environment began." *Id.* She notes that over 38 days went missing from her vacation bank. *Id.* Pitts verified with Colonel Paul Abell ("Abell"), who "was in charge of Fiscal," that her "P-days" were being changed to "V-days" which was depleting her vacation leave. *Id.* Pitts claims she raised these issues with Norris and Matthews, who denied wrongdoing and refused to correct the issue. *Id.*

In the second incident, Pitts contends that then-City Solicitor Rodney Hill ("Hill") contacted her to schedule a dinner so they could discuss her cases in advance of his appointment to Chief of Internal Affairs. *Id.* Pitts "advised him that [she] didn't feel comfortable doing that," and Hill informed her he was arranging similar dinners with all of his supervisors. *Id.* at 5. Pitts later asked another sergeant in the department whether Hill had requested to meet with him for dinner, and the sergeant reported Hill had not. *Id.* At this dinner, Pitts alleges that Hill asked her to change her complaint finding against Major Ian Dombrowski ("Dombrowski") from substantiated to unsubstantiated because Hill was concerned that a substantiated finding would cause Dombrowski to lose his law license. (Def.'s Mot. Summ. J. Ex. 1, at 34-38, ECF No. 50-2). Pitts

refused to do so, and contends that after this dinner, harassment and hostility in the workplace escalated. *Id.*; Pl.'s Opp'n to Def.'s Mot. Summ. J., Ex. 2, at 5, ECF No. 69-5.

Pitts filed an EEOC charge on January 23, 2014, alleging harassment by Norris and Director Laura Giantris, who had replaced Matthews by that time. Pitts specifically alleged:

> I began working in the EEO Department in 2010. Throughout my tenure, I have made guilty findings against several prestigious members of the department. As a result, I have been subjected to workplace harassment from Director Laura Giantris. I have also been subjected to harassment from Lieutenant Michael Norris. I am made to report my whereabouts at all times even when I am only going to the restroom. I am advised not to interview employees without approval from Ms. Giantris which prolongs the investigation and then I am subjected to intimidation by Lt. Norris when my deadlines are approaching. I am allowed to assist my peers with their investigations but [sic] do not reciprocate. I have had over 36 days of leave taken out of my leave bank and I have not been paid for overtime worked.

(Def.'s Mot. Summ. J. Ex. 2, at 2, ECF No. 50-3). On February 4, 2014, Lieutenant Jason Yerg ("Yerg"), who was at the time assigned to the Internal Affairs Division, contacted Pitts by email to obtain a statement from her in reference to the EEOC complaint. (Pl.'s Opp'n to Def.'s Mot. Summ. J., Ex. 9, ECF No. 69-12).[4] Hill was also copied on the email correspondence. *Id.* Pitts declined to make a statement and indicated she would rather "let the outside Agencies investigate[.]" *Id.* She added that she "was being blissfully naïve, until [she] saw the Posting yesterday." *Id.*

At some point thereafter, Yerg was transferred to the EEO office and acted as Pitts' supervisor, replacing Norris.[5] Pitts characterizes Yerg and Giantris' transfer to the EEO unit as "uncomfortable" and further explained:

---

[4] In an earlier email sent to Hill dated January 30, 2014, Pitts initially expressed a preference for Yerg to conduct the investigation. (Def.'s Mot. Summ. J. Ex. 2, at 3, ECF No. 50-3). Per Pitts' May 12, 2015 IAD complaint, she later changed her mind. (Pl.'s Opp'n to Def.'s Mot. Summ. J., Ex. 3, at 3, ECF No. 69-6).
[5] Plaintiff testified that upon filing her January 23, 2014 EEOC charge, Hill moved Norris to a new unit despite Pitts' request that *she* be transferred, rather than Norris. (Def.'s Mot. Summ. J. Ex. 1, at 45, ECF No. 50-2).

> When [Giantris] got there she was civilian, she was putting things in place, and [Yerg] didn't know anything about EEOC. So now I have to teach you the rules, you have to do training, you have to be certified, going to bring you up-to-date where we are, and immediately it was just one thing after another.

(Def.'s Mot. Summ. J. Ex. 1, at 54, ECF No. 50-2). Pitts additionally testified to two conversations between herself, Giantris, and Yerg, wherein Yerg threatened to charge Pitts with insubordination for requesting that a policy change be put in writing. *Id.* at 46.[6] Pitts asserts these interactions made her "leery about having any kind of interaction with [Yerg] as well as Giantris" because even though she was doing her job and her "due diligence" she didn't feel "comfortable or safe" because they were threatening to "charge [her] with something they obviously [knew] [she] did not do." *Id.* at 63-64.

Pitts also contends that Yerg interfered with her Family Medical Leave Act ("FMLA") leave and improperly disciplined her for being late after they had agreed to a schedule which permitted her to start work in the late morning. *Id.* at 54. Pitts was approved for FMLA leave in order to care for a family member, and began taking days off work to take her family member to medical appointments. *Id.* Pitts reports that Yerg requested she take less leave because the office was "falling behind because the Sergeants also work cases." *Id.* Pitts testified that, prior to Yerg and Giantris's arrival to the department, she worked 11:00 to 7:00 or 12:00 to 8:00. *Id.* Yerg and

---

[6] Pitts described the first conversation in her deposition:

> So the civilian director Giantris was changing things and I would ask, okay, do you want me to type that up and put it in writing if you're going to change the policy so the squad knows what the new rules are. At which point Yerg said, you're going to be charged with insubordination if you do that again. At which point I advised him I'm asking for clarification.
>
> If you're going to change a policy we have to notify the employees that this is not the way we're going to do it. So in no way is that being insubordinate. He's brand new. I'm teaching him the job. So he said, well, just watch yours. I'm never excited, I'm never yelling. So it was no cause for that. And she said, no, I'll type it up, I'll do it, I'll disseminate it. That's fine. So I can't advise my employees rules have changed until it's in writing somehow some way."

(Def.'s Mot. Summ. J. Ex. 1, at 46, ECF No. 50-2).

Giantris initially requested that Pitts change her hours to "daytime hours" – 8:00 to 4:00 or 9:00 to 5:00 – which she did. *Id.* However, when Yerg asked Pitts to take fewer FMLA leave days off, they agreed that she could return to starting her work later in the day (presumably to accommodate her family member's medical appointments). *Id.* On May 1, 2014, Yerg issued a non-punitive counseling memo to Pitts indicating that she had violated department rules by failing to report to the office by 10:00am each day. (Pl.'s Opp'n to Def.'s Mot. Summ. J., Ex. 14, ECF No. 69-17). Pitts further alleges that Yerg and Giantris denied her FMLA after it was approved by the medical unit, but that by that point her family member required less care, and she opted not to contest it. (Def.'s Mot. Summ. J. Ex. 1, at 55-56, ECF No. 50-2).

On January 30, 2015, Yerg prepared a performance evaluation for Pitts covering the period from July 1, 2014 to December 31, 2014. (Def.'s Mot. Summ. J. Ex. 12, ECF No. 56). The evaluation was formatted such that Yerg checked boxes ranging from "unsatisfactory" to "outstanding" in different categories (i.e., "regular duties," "cooperation," and "economy in management"). *Id.* Yerg indicated that Pitts needed improvement in seven categories, including in the performance of her regular duties. *Id.*[7] Yerg also completed a narrative section in the evaluation, where he noted that Pitts "appeared to be 'disengaged' as a supervisor" and described specific feedback Pitts was provided on July 10, 2014:

> I would like your work day to begin at 9:00am arrival; unpack and organize your office to ensure that cases are readily accessible and easy to find, as well as to project a professional appearance to visitors; attempt to schedule interviews of complainants within 48 hours of receipt of case (when circumstances beyond your control prevent timely scheduling of complainant interviews, explain in writing of the reasons for the delay.); upon the identification of an accused member, timely serve Notification of Investigation (e.g. within five days of receipt of case or identification via investigation). Notifications should be submitted to the Director

---

[7] There were 20 categories in total, and Yerg indicated "not observed" for six categories, "average" in five categories, "above average" in one category ("personal appearance"), and "excellent" in one category ("loyalty"). (Def.'s Mot. Summ. J. Ex. 12, ECF No. 56).

through the Lieutenant for approval; conclude investigations and submit for review prior to 90 days from receipt; conduct weekly case review with [officers] noting progress and providing guidance with respect to completion and direction of investigation; conduct a thorough review of completed cases under your purview and expeditiously forward the cases with your corrections annotated through channels, monitor the assigned vehicles preventative maintenance schedule and ensure that vehicles are serviced as required; coordinate future 'Details' and ensure proper notifications are made and deadlines are met; respond to rehire, background and PIO requests in my absence; maintains the "big book" with regard to attendance and leave; preliminarily authorize/approve leave after ensure [sic] the Section is adequately staffed; minimize unscheduled absences; mentor junior detectives.

*Id.* Yerg further stated that communication had improved since the July 10, 2014, feedback, but that "arrival time continues to be an issue." *Id.* He added that her office remained disorganized, and her "comparatively small caseload. . .languished for an unacceptably long period of time." *Id.*[8]

Pitts provided a rebuttal to Yerg's performance evaluation on February 4, 2015, which was sent to Commissioner Batts, Giantris, and Yerg. *Id.* Pitts noted her twenty-eight years of service, twenty of which were as a Sergeant. *Id.* She explained that she takes her career and reputation seriously, as is "documented very well in [her] previous performance evaluations." *Id.* Pitts further stated that she believed the evaluation was a form of retaliation for the January 2014 EEOC charge, she was not adequately allowed to supervise detectives, and that on several occasions Yerg "gave [her] instructions on how to approach certain issues, only to retract the guidance provided because [Giantris] made changes without notifying us[,]" causing the office to be "always in a state of confusion." On March 14, 2015, Giantris executed a memorandum indicating she had reviewed Yerg's performance evaluation of Pitts and concurred with his evaluation "in its entirety." *Id.*

The Maryland Commission of Civil Rights ("MCCR") conducted an investigation into Pitts' January 2014 EEOC charge and on October 16, 2015, and concluded there was no probable

---

[8] Yerg appears to have continued the evaluation narrative on a separate page, but it was not provided to the Court.

cause to believe that BPD discriminated against Pitts on the basis of sex or race, or retaliated against her for opposing discriminatory activities in the workplace.  (Def.'s Mot. Summ. J. Ex. 2, at 12, ECF No. 50-3). According to a timeline prepared by Pitts on August 7, 2015, the United States EEOC dismissed her January 2014 EEOC charge on March 30, 2015, because they "never received [her] rebuttal for the BPD's position statement." (Def.'s Mot. Summ. J. Ex. 3, at 6, ECF No. 50-4).

### ii.  May 12, 2015 IAD Complaint & May 13, 2015 MCCR Complaint

On February 5, 2015, Yerg was transferred out of the EEO office and replaced by Lieutenant Jason Callaghan ("Callaghan"). (Def.'s Mot. Summ. J. Ex. 13, ECF No. 50-14). Pitts describes the EEO workplace following Callaghan's transfer in her answers to interrogatories:

> The office atmosphere was hostile, and tense, which became progressively worse as Giantri[s] and Callaghan began telling my Detectives to change their sustained cases to not sustained. I advised Giantris and Callaghan that my detectives were not going to follow an illegal order, and the findings were going to stay sustained. After that occurred, Giantris and Callaghan limited my involvement with case reviews, interviews, and so forth.

(Pl.'s Opp'n to Def.'s Mot. Summ. J. Ex. 2, at 5, ECF No. 69-5). Pitts additionally reports that Callaghan instructed her to organize and clean the file room, including moving filing cabinets, which was not within the scope of her duties as a sergeant or that of the detectives she supervised. (Def.'s Mot. Summ. J. Ex. 1, at 70, ECF No. 50-2).

On April 15, 2015, Callaghan submitted a memorandum to Giantris regarding his ongoing review of Pitts' work performance. (Def.'s Mot. Summ. J. Ex. 10, ECF No. 54). Callahan advised Giantris of many "observed deficiencies" including:

- Pitts' lack of progress on two investigations which were assigned in June 2014.
- Pitts' lack of detail when questioned on the progress of her assigned investigations. ("One of the items I addressed with her was her decision to not

conduct a recorded interview with an individual that I thought may be an important witness in her case. She simply advised that the Director had told her to do a telephone interview.")

- Callaghan advised Pitts on March 26, 2015 that she was required to complete two investigations by April 10, 2015, which was her last workday prior to a lengthy vacation. Pitts stayed late to complete one investigation but was unable to complete the other. "She simply advised that she could not complete the other case in time. There was no request for an extension beforehand and no reasons given for her failure to meet the deadline."

- Pitts was instructed to ensure the file room was cleaned and organized by April 15, 2015.[9] "There was a great deal of resistance provided against this task. At one point she suggested that we should hire an outside company to complete the work. She also indicated that her contract prevented such tasks from being assigned to her."

- Pitts' failure to provide proper guidance to her assigned detectives and refusal to conduct performance evaluations.

- Pitts' assigned detectives turned in completed cases directly to Callaghan, without review by Pitts.

- Pitts' chronic lateness.

*Id.* Callaghan recommended that Pitts be involuntary transferred to a different unit. *Id.*

On May 4, 2015, BPD Detective Chwantay Willie ("Willie") experienced a medical emergency at the EEO office which required transportation to the emergency room. (Def.'s Mot. Summ. J. Ex. 1, at 71-72, ECF No. 50-2; Ex. 10, ECF No. 54). Pitts accompanied Willie to the emergency room. *Id.* Before Pitts and Willie departed, Callaghan inquired as to the location of Willie's firearm. *Id.* There are several different accounts of what followed: Pitts testified in her deposition that she told Callaghan she had secured Willie's firearm, and would give it to Willie's husband at the hospital because it was a personal, rather than departmental, weapon. (Def.'s Mot. Summ. J. Ex. 1, at 71-72, ECF No. 50-2). Callaghan described in a 2015 report that Pitts ignored his direct order to check Willie's purse for the firearm, told him to "write [her] up" and slammed the door on her way out of the office. (Def.'s Mot. Summ. J. Ex. 10, ECF No. 54). According to

---

[9] The Court notes that this deadline appears to be during Pitts' vacation, according to the dates in Callaghan's evaluation.

one civilian witness, she heard Pitts' response to Callaghan as "I got this" and reported that the door closing may have been louder than usual. *Id.* Detective Yvette Dewgard was also interviewed in relation to the incident, and noted that the door "has a spring on it" and naturally slams. *Id.* Pitts stated in her 2015 interview that Callaghan ordered her to secure the firearm in the gun box and she responded that it was secured in her possession. *Id.* Despite these conflicting accounts, it appears undisputed that Pitts took the weapon to the hospital, and that Callaghan retrieved the firearm from Pitts at the hospital thereafter. *Id.*

The next day, May 6, 2015, Callaghan entered administrative charges against Pitts for insubordination and misconduct for disobeying an order. *Id.* Callaghan additionally submitted a memorandum to Giantris on May 7, 2015, advising her of his concerns regarding Pitts' conduct and stating his belief that "Pitts does not have any intention of working cooperatively with the supervision of this section." *Id.* Pitts alleges that she was disparately treated for the same conduct as another colleague who had, in the weeks prior, also taken Willie's firearm to the hospital under the same circumstances. (Def.'s Mot. Summ. J. Ex. 1, at 72, ECF No. 50-2). Pitts filed a complaint with the Internal Affairs Division ("IAD") on May 12, 2015, against Giantris, Hill, Yerg, and Callaghan, alleging retaliation in response to her 2014 EEOC charge and hostile work environment. (Pl.'s Opp'n to Def.'s Mot. Summ. J. Ex. 3, at 2, ECF No. 69-6). On May 13, 2015, Pitts also filed a complaint with the MCCR, raising the same allegations. (Pl.'s Opp'n to Def.'s Mot. Summ. J. Ex. 6, at 2, ECF No. 69-9).

On January 12, 2016, Pitts appeared before a trial board in relation to the firearm incident. (Def.'s Mot. Summ. J. Ex. 10, ECF No. 54). The Trial Board concluded that Callaghan gave Pitts a direct order to check for the weapon, and that "Pitts was insubordinate and disobeyed Lieutenant

Callaghan's direct order." *Id.* She was found guilty of disobeying a lawful order and received a punitive counseling memorandum on February 29, 2016. *Id.*

### iii.  June 13, 2017 EEOC Charge

#### 1.  Juvenile Booking Detail

Following her May 2015 IAD and EEOC complaints, Pitts was detailed to Juvenile Booking on June 1, 2015. (Pl.'s Opp'n to Def.'s Mot. Summ. J. Ex. 2, at 6, ECF No. 69-5).[10] Just days before, on or about May 29, 2015, Callaghan submitted an IAD complaint against Pitts alleging that she was "in possession of confidential medical records of numerous unnamed employees of the Baltimore Police Department without cause and in violation of Departmental rules and regulations." (Def.'s Mot. Summ. J. Ex. 11, ECF No. 55). According to the IAD report, Pitts was permitted to return to her EEO office to gather her personal belongings prior to reporting to Juvenile Booking. *Id.* Pitts informed Callaghan that she needed to return to the office to retrieve medical files at a later time. *Id.* Callaghan and Giantris reviewed the files, determined that they were records from Pitts' prior position in the Medical Unit, and that "Pitts had no reason to be in possession of such records as related to any investigation through EODS." *Id.*

Pitts maintains that the documents were primarily law related, but may have contained medical material, and were certainly confidential. (Def.'s Mot. Summ. J. Ex. 1, at 88, ECF No. 50-2). Per the IAD report, Pitts retained the records after she was transferred from the Medical Unit in 2010 to keep them secure because she was not immediately replaced by another supervisor in

---

[10] There are differing accounts regarding the circumstances underlying Pitts' detail to Juvenile Booking. Pitts alleges that the detail was in response to her EEOC complaint, and that Hill phoned her after the complaint was filed to inform her that Giantris was being let go from the department, effective June 1, 2015, and to ask Pitts where she wanted to be assigned. (Pl.'s Opp'n to Def.'s Mot. Summ. J. Ex. 2, ECF No. 69-5). Pitts states she told him she no longer wanted to leave the EEO office "because they were targeting Black Males, and I wanted to make sure everything was fair[,]" but was reassigned nonetheless. *Id.* at 6. According to IAD investigation report involving Pitts' alleged improper possession of medical records, "Callaghan stated that the reason Pitts was being detailed was because of a previous insubordination case against her." (Def.'s Mot. Summ. J. Ex. 11, ECF No. 55).

the unit. (Def.'s Mot. Summ. J. Ex. 11, ECF No. 55). She stated that Yerg was eventually assigned as the new Medical Unit supervisor, and that she contacted him on an unknown date to return the documents. *Id.* Yerg purportedly declined the documents, "telling her that they had a new database and 'they were going to do everything over.'" *Id.* Pitts indicated that she intended to destroy the documents "by scheduling a 'burn' through her new position in EODS" and that she asked Norris several times when a burn would take place. *Id.* Norris and Yerg denied that these conversations ever took place. *Id.* On March 16, 2016, Dombrowski advised Pitts that the IAD investigation resulted in a "finding of Sustained for the allegation(s) of Misconduct/General." *Id.* Pitts states that she requested a Trial Board to contest the finding, but was told her attorney had already accepted an involuntary transfer as a form of punishment on her behalf. (Def.'s Mot. Summ. J. Ex. 1, at 88, ECF No. 50-2). Pitts maintains that she fired her attorney following her first trial board and he had no authority to accept the transfer. *Id.*[11]

### 1. Northern District Patrol Detail

Pitts was verbally detailed to the North District Patrol in May 2016. (Pl.'s Opp'n to Def.'s Mot. Summ. J. Ex. 2, at 6, ECF No. 69-5).[12] She states that a white male sergeant from the Northern District was transferred to fill her EEO position at the same time. *Id.* On June 13, 2017, Pitts filed

---

[11] Defendant notes that "[o]n or about August 15, 2016, Pitts confirmed via email response that she had been "able to work out a legal settlement in lieu of taking an administrative hearing" until [the attorney] failed to show up for the meeting wherein Pitts was to sign for her punishment acceptance." (Def.'s Mem. Supp. Summ. J., at 22 n.6, ECF No. 50-1). This characterization is somewhat misleading: Pitts did not write an email stating she was "able to work out a legal settlement in lieu of taking an administrative hearing" – she merely *responded* to an email written by someone else containing this language. (Def.'s Mot. Summ. J. Ex. 11, ECF No. 55). The email correspondence reflects that Pitts arranged a meeting to sign for her punishment acceptance on August 19, 2016. *Id.* Defendant further provides a handwritten note, purportedly prepared by Pitts, which is dated August 19, 2016 and states the attorney "didn't show & the transfer info was open ended & didn't specify my assignment. I refused to sign and accept same." The same note indicates a phone call between Pitts and the attorney then took place, and he "insisted on telling me what he wanted me to agree with for transfer purposes. I requested a trial board." *Id.*

[12] Pitts additionally alleges that she requested a meeting with Commissioner Kevin Davis, who replaced Commissioner Batts, to discuss the extension of her detail to Juvenile Booking for over 60 days. (Def.'s Mot. Summ. J. Ex. 1, at 80, ECF No. 50-2). Pitts states that she is contractually entitled to such a meeting and put in a request, but never received a reply. *Id.*

another EEOC charge,[13] alleging retaliation in response to her May 2015 MCCR charge. (Pl.'s Opp'n to Def.'s Mot. Summ. J. Ex. 7, at 2, ECF No. 69-10). Pitts contended that her involuntary reassignments constituted retaliation, explaining:

> In July 2015, I filed a Charge of Discrimination…against my employer, with the Maryland Commission on Civil Rights (MCCR). My Charge alleged discrimination in the form of disciplinary action and terms and conditions of employment. As a result of filing that Charge, I have been subjected to ongoing retaliation in the form of assignment. Specifically, after filing the Charge, I was removed from my position which I had worked for approximately 5 years, and reassigned to a "detail." I have been on detail and not returned to my position since July 2015. The details to which I have been assigned are less favorable than my previous permanent position. . . I have not been given a valid or reasonable explanation for Respondent [sic] actions or the reasons I continue to be "detailed" into various less favorable positions since filing my charge.

*Id.* Pitts further noted that on June 12, 2017, she overheard a conversation at the station where it was stated that Lieutenant Sean Mahoney ("Mahoney") would be assigned to the same shift as Pitts to "target" her. (Def.'s Mot. Summ. J. Ex. 4, at 4, ECF No. 50-5). Pitts testified that she met with Mahoney and Major Gibson ("Gibson"),[14] the commander of the Northern District at that time, and advised them that she had filed an EEOC complaint against them. (Def.'s Mot. Summ. J. Ex. 1, at 109, ECF No. 50-2). Pitts brought another officer to attend the meeting as "an independent witness," and told Mahoney and Gibson that she did not feel comfortable working with them because Gibson was sending Mahoney to the shift to target her. *Id.* at 109-10. According to Pitts, Gibson replied that he would not reassign her because they were short on sergeants. *Id.*

While Pitts was detailed to the Northern District it was alleged that she failed to report a crime on January 17, 2017. *Id.* at 120-21. Pitts received notice of the IAD investigation on August

---

[13] Defendant states that the May 2015 EEOC charge was dismissed as untimely, citing to page 9 of Exhibit 4 attached to its Motion for Summary Judgment. (Def.'s Mem. Supp. Summ. J., at 25 n.9, ECF No. 50-1). However, the document attached appears to have formatting errors which render it largely unreadable, and the box for indicating that a charge was not timely filed is not checked. (Def.'s Mot. Summ. J. Ex. 4, at 9, ECF No. 50-5).

[14] Pitts testified that she and Gibson discussed her EEOC complaints. (Def.'s Mot. Summ. J. Ex. 1, at 102, ECF No. 50-2).

16, 2017 via a notification issued by Hill. (Def.'s Mot. Summ. J. Ex. 15, ECF No. 58). Approximately 10 days prior, on August 7, 2017, a letter signed by Hill was issued informing Pitts that "the investigation resulted in a CIU finding of Not Sustained for the allegation of Neglect of Duty." (Pl.'s Opp'n to Def.'s Mot. Summ. J. Ex. 16, ECF No. 69-19). Pitts alleges the investigation was initiated by Gibson in response to her EEOC complaints, despite a different BPD lieutenant being responsible for reporting the crime at issue. (Def.'s Mot. Summ. J. Ex. 11, at 120-21, ECF No. 50-2). Pitts states the investigation forced her to go to IAD, give a statement, obtain a lawyer, and that she experienced "several stressful months." *Id.*; Pl.'s Opp'n to Def.'s Mot. Summ. J. Ex. 2, at 6, ECF No. 69-6.

Mahoney was assigned to supervise Pitts and completed a performance evaluation for the period from July 1, 2017 to December 31, 2017. (Def.'s Mot. Summ. J. Ex. 14, ECF No. 57). The evaluation followed the same format as Yerg's January 2015 evaluation, with the evaluator checking boxes ranging from "unsatisfactory" to "outstanding" in different categories. *Id.* Mahoney indicated that Pitts needed improvement in the "endurance" and "loyalty" categories. *Id.* The remaining categories were marked between "average" and "excellent." *Id.* In the narrative section of the evaluation, Mahoney described Pitts as "generally a good person who works well with the rest of the members of the shift." He noted that "[w]hen she is here," she "does a good job[,]" and further explained that "[u]nfortunately, Sergeant Dietra Pitts works only fifty percent of the time she is scheduled and is calling in medical the rest of the time. This has a negative impact on the shift and diminishes her overall performance." *Id.* Pitts provided a rebuttal to Mahoney's evaluation on January 13, 2018, wherein she expressed that she had "difficulty believing" that the evaluation was fair and impartial due to the conversation she overheard regarding Mahoney

14

targeting her and her subsequently filed EEOC charge. *Id.* She added that she was experiencing "a few minor medical issues" but that "all of [her] work obligations were completed[.]" *Id.*

Pitts went on medical leave on April 26, 2018. (Def.'s Mot. Summ. J. Ex. 9, ECF No. 53). "A couple days or so" before, Pitts alleges Sergeant Benjamin Frieman ("Frieman") approached her while they were working and asked her if she was "worried about being the next Det. Sean Suiter, when [she goes] to get [her] Starbucks coffee every morning at 5am." (Pl.'s Opp'n to Def.'s Mot. Summ. J. Ex. 2, at 6, ECF No. 69-6). According to Pitts, Suiter is a former BPD detective who was killed under unknown circumstances. (Def.'s Mot. Summ. J. Ex. 1, at 115-16, ECF No. 50-2). Pitts felt physically threatened by this comment due to the reference to Suiter and Friemann's knowledge of her schedule, which she had not previously conveyed to him. *Id.* Pitts subsequently "went out for stress medical." (Pl.'s Opp'n to Def.'s Mot. Summ. J. Ex. 2, at 6, ECF No. 69-6).

iv.  February 4, 2021 EEOC Charge

While Pitts was on medical leave, she participated in regular counseling sessions and her treating provider continued to recommend that she remain on leave. (Pl.'s Opp'n to Def.'s Mot. Summ. J. Ex. 21, ECF No. 69-21). Pitts contends that on August 8, 2019, she visited the Northern District to deliver a document and was told to contact Lieutenant Amey ("Amey") regarding her "408 letter." (Def.'s Mot. Summ. J. Ex. 4, at 8, ECF No. 50-5). According to the BPD Medical Policy provided by Defendant, a 408 letter is issued when an officer has been "determined to be permanently unable to perform the duties of a police officer." (Def.'s Mot. Summ. J. Ex. 19, at 6, ECF No. 50-20). Pitts responded that she was not deemed permanently disabled by her treating provider and so was not eligible for a 408 letter, "at which time Lt. Amey explained that the new contract included a section for members on extended medical leave for 2 years could receive a 408

15

letter." (Def.'s Mot. Summ. J. Ex. 4, at 8, ECF No. 50-5). Pitts states she confirmed with her attorney that she was not due to receive a 408 letter and did not follow up with Lieutenant Amey. *Id.* Pitts then provided an update to the EEOC on September 17, 2019, expressing her concern that BPD was trying to medically suspend her so that she would be unarmed. *Id.*

Amey submitted a request for a 408 letter for Pitts on December 23, 2019, and the letter was issued by Major James Rhoden ("Rhoden") the same day. (Def.'s Mot. Summ. J. Ex. 9, ECF No. 53). The letter stated that "the maximum period of twelve (12) months from the date of onset" of Pitts' non-line of duty injury has been exhausted, and she had "90 days to file for the appropriate retirement benefits, separate from service or…seek reassignment to a civilian position[.]" *Id.* Pitts acknowledged receipt of the letter by signature on December 30, 2019, *id.*, but testified in her deposition that she attempted to return to work and was denied the opportunity to do so by Rhoden. (Def.'s Mot. Summ. J. Ex. 1, at 126, ECF No. 50-2; Ex. 5, at 2, ECF No. 50-6). According to Pitts, Rhoden informed her she could not return because she exceeded one-year of medical leave, which was the maximum permitted. (Def.'s Mot. Summ. J. Ex. 1, at 126, ECF No. 50-2). Per Pitts' answers to interrogatories and deposition testimony, her injury was a "line of duty" rather than a "non-line of duty" injury, which meant that she should have qualified for two years of medical leave rather than one. (Pl.'s Opp'n to Def.'s Mot. Summ. J. Ex. 2, at 6, ECF No. 69-6). Pitts asserts that she communicated this to Rhoden, who replied, "I don't have an EIR [an "Employee Incident Report"] for that, so complete one today (12-30-2019) and I'll have to medically suspend you." *Id.* Pitts contends that when she went on medical leave in April 2018, she was instructed not to complete an EIR. (Def.'s Mot. Summ. J. Ex. 1, at 126, ECF No. 50-2). She attached a copy of an EIR dated December 30, 2019 to her opposition to BPD's Motion for Summary Judgment. (Pl.'s Opp'n to Def.'s Mot. Summ. J. Ex. 18, at 38, ECF No. 69-21). Computer records produced by

BPD designate Pitts as having a non-line of duty injury. (Def.'s Mot. Summ. J. Ex. 9, ECF No. 53).

Pitts applied for retirement on April 27, 2020, seeking a retirement date of July 1, 2020. (Def.'s Mot. Summ. J. Ex. 8, ECF No. 52). However, an internal email sent on May 15, 2020 to Amey indicated that Pitts had no pending application. (Def.'s Mot. Summ. J. Ex. 9, ECF No. 53).[15] On May 25, 2020, Rhoden sent a letter to Pitts informing her BPD received notice that she had failed to file a complete retirement application and that consequently she was "being separated from the department immediately" due to her "inability to perform the essential functions of a full-duty police officer." *Id.* Pitts states that the first time she learned of her termination was in July 2020, when she went to headquarters to return some departmental equipment. (Pl.'s Opp'n to Def.'s Mot. Summ. J. Ex. 2, at 6-7, ECF No. 69-5). As a result, Pitts' retirement benefits were delayed, but her status was ultimately corrected to "retired." *Id.* Pitts indicates that Amey apologized to her, and she was later contacted by an EEO officer for a telephone inquiry because "Amey filed an EEO complaint against Major Rhoden in reference to [her] case." *Id.* at 7.

On February 4, 2021, Pitts filed a final EEOC charge wherein she contended she was subject to retaliation following her past EEOC charges and IAD complaint, and alleging she was forced into retirement by Rhoden. (Def.'s Mot. Summ. J. Ex. 5, at 2, ECF No. 50-6) (ECF No. 50-6 at 2). The EEOC issued Pitts a notice of her right to sue on March 9, 2022, and this action followed.

      b.  <u>Procedural History</u>

---

[15] BPD also provided an email dated March 23, 2020, prior to the submission of Pitts' application, reflecting the same information. (Def.'s Mot. Summ. J. Ex. 9, ECF No. 53).

Pitts' Complaint set forth four counts against BPD: retaliation (Count I) and hostile work environment (Count II) in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e *et seq.*, retaliation under 42 U.S.C. § 1983 (Count III), and retaliation in violation of the Maryland Fair Employment Practices Act, Md. Code Ann., State Gov't, § 20-601 *et seq.* (Count IV). (Compl., ECF No. 1).   BPD moved to dismiss Pitts' Complaint, arguing (1) Pitt's complaint was untimely filed; (2) Pitts' EEOC charge giving rise to the Complaint was untimely filed; (3) Pitts' Complaint exceeded the scope of her EEOC charge; (4) Pitts did not allege facts sufficient to state a claim entitling her to relief under Title VII, § 1983, or MFEPA; and (5) immunity from MFEPA claims in federal court. (Def.'s Mot. to Dismiss, ECF No. 5).   Judge Bennett dismissed Counts I, III, and IV with prejudice, explaining that "Pitts was erroneously terminated approximately three years after she last engaged in a protected activity" and Pitts therefore failed to establish a causal connection "through sufficient temporal proximity" between her June 2017 EEOC charge and 2020 termination. *Pitts*, 2023 WL 3158705 at *8-10. Count II was permitted to proceed to discovery. *Id.*

## II.    LEGAL STANDARD

Federal Rule of Civil Procedure 56(a) requires the Court to "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."   A dispute as to a material fact "is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."   *J.E. Dunn Const. Co. v. S.R.P. Dev. Ltd. P'ship*, 115 F. Supp. 3d 593, 600 (D. Md. 2015) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).   A nonmoving party "opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'"

*Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (quoting Fed. R. Civ. P. 56(e)).

The Court is "required to view the facts and draw reasonable inferences in the light most favorable to" the nonmoving party. *Iko v. Shreve*, 535 F.3d 225, 230 (4th Cir. 2008) (citing *Scott v. Harris*, 550 U.S. 372, 377 (2007)). However, the Court must also "abide by the 'affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial.'" *Heckman v. Ryder Truck Rental, Inc.*, 962 F. Supp. 2d 792, 799–800 (D. Md. 2013) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993)). Consequently, a party cannot create a genuine dispute of material fact through mere speculation or compilation of inferences. *See Deans v. CSX Transp., Inc.*, 152 F.3d 326, 330–31 (4th Cir. 1998). "[I]n the face of conflicting evidence, such as competing affidavits, summary judgment ordinarily is not appropriate, because it is the function of the fact-finder to resolve factual disputes, including matters of witness credibility." *Angelini v. Balt. Police Dep't*, 464 F. Supp. 3d 756, 776 (D. Md. 2020).

## III. ANALYSIS

"A court may only consider Title VII claims that fall within the applicable limitations period." *Id.* at 786. Accordingly, the undersigned will begin by addressing BPD's argument that Pitts' claim is time-barred and therefore fails as a matter of law. (Def.'s Mem. Supp. Summ. J., at 34, ECF No. 50-1). BPD contends that "Pitts' claim fails *ab initio* because she cannot establish any retaliatory event occurred within 300 days of the filing of the operative EEOC Charge." *Id.* Under Maryland law, "a charging party must file an EEOC Charge within 300 days of the alleged unlawful employment practice." *Van Slyke v. Northrup Grumman Corp.*, 115 F. Supp. 2d 587, 592 (D. Md. 2000) (citing 42 U.S.C. § 2000e-5(e)(1)). If a charge is not filed within 300 days, "alleged discriminatory acts which occurred more than 300 days prior to the filing of the EEOC charge may

not be subsequently challenged in a Title VII suit." *Id.* (citing *Beall v. Abbott Laboratories*, 130 F.3d 614, 620-21 (4th Cir. 1997)); *see also Gilliam v. S.C. Dep't of Juv. Just.*, 474 F.3d 134, 139 (4th Cir. 2007) ("In order to pursue a Title VII claim, a plaintiff must first file an administrative charge with the EEOC. Any subsequent complaint in federal court can only be premised on acts of discrimination that occurred within the applicable limitations period." (internal citation omitted)).

Discrete acts of discrimination which occur prior to the 300-day limitations period "are procedurally barred and cannot be used as a basis for recovery." *Gilliam*, 474 F.3d at 139. However, under the continuing violation doctrine, "a Title VII plaintiff may obtain recovery for discriminatory acts that otherwise would be time-barred so long as another act fell within the limitations period and the acts are part of an ongoing pattern of discrimination." *Angelini*, 464 F. Supp. 3d at 787 (citing *Gilliam*, 474 F.3d at 140). In *National Railroad Passenger Corporation v. Morgan*, the United States Supreme Court considered the application of the continuing violation doctrine to hostile work environment claims, observing:

> Hostile environment claims are different in kind from discrete acts. Their very nature involves repeated conduct. The "unlawful employment practice" therefore cannot be said to occur on any particular day. It occurs over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be actionable on its own. Such claims are based on the cumulative effect of individual acts.

536 U.S. 101, 115 (2002) (internal quotations and citations omitted). The Court therefore held that "[p]rovided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability." *Id.* at 117. "In order for a charge to be timely, the employee need only file a charge within 180 or 300 days of any act that is part of the hostile work environment." *Id.* at 118. However, the

act which occurred within the limitations period must pertain specifically to the hostile work environment claim, and cannot simply be an unrelated act, even if it is independently discriminatory. *Id.*; *see also Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 222 (4th Cir. 2016) ("[E]ven if most of the harassing conduct on which a plaintiff relies to establish her hostile work environment claim occurred outside the statutory period, the claim will be considered timely if at least one act *continuing the violation* occurred within the statutory period." (emphasis added)); *King v. Aramark Servs., Inc.*, 96 F.4th 546, 561 (2d Cir. 2024) ("A discrete discriminatory act, such as termination, within the limitations period may not only support a claim for damages, it may also render a hostile work environment claim timely *if it is shown to be part of the course of discriminatory conduct that underlies the hostile work environment claim*." (emphasis in original)).

Pitts does not address the merits of BPD's timeliness argument, and instead references Judge Bennett's April 28, 2023 Memorandum Opinion addressing BPD's Motion to Dismiss. BPD raised a similar argument in its Motion to Dismiss, advocating that the Court should not consider Pitts' allegations predating April 10, 2020—300 days before Pitts' February 4, 2021 EEOC charge. *Pitts*, 2023 WL 3158705 at *5. Judge Bennett declined to do so, citing *Morgan*, and explained:

> [I]n the 2021 EEOC Charge and the instant Complaint, Pitts claims that she was discharged on June 19, 2020, when she was informed of her termination. According to her, she was informed that she was terminated despite acquiescing and adhering to Rhoden's instructions that she must retire before July 1, 2020. Although BPD remedied this error, Pitts' alleged termination on June 19, 2020, is the most recent "unlawful employment practice." This fell within the period of Discrimination identified in her EEOC Charge and within the 300-day period required for EEOC Charges. Accordingly, the Court may consider the "entire time period of the [alleged] hostile environment" because the unlawful practice occurred within the 300-day window.

*Id.* (internal citations and quotations omitted).

As BPD accurately notes, different legal standards are applied when deciding motions to dismiss and motions for summary judgment. When considering a motion to dismiss, "the Court must accept the complaint's allegations as true, and must liberally construe the complaint as a whole." *Humphrey v. Nat'l Flood Ins. Program*, 885 F.Supp. 133, 136 (D. Md. 1995) (internal citations omitted). By contrast, at the motion for summary judgment stage, a party "opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat*, 346 F.3d at 522 (quoting Fed. R. Civ. P. 56(e)). Speculation or a compilation of inferences will not suffice to defeat a motion for summary judgment. *Deans*, 152 F.3d at 330-31. Judge Bennett's determination that Pitts' 2020 termination sufficed to anchor Pitts' hostile work environment claim within the 300-day limitations period was predicated solely on the allegations set forth in her Complaint—as is appropriate when deciding a motion to dismiss. However, in order to survive BPD's Motion for Summary Judgment, Pitts must now set forth specific facts demonstrating her 2020 termination is a continuation of the hostile work environment she alleges occurred between 2014 and 2018. She has failed to do so.

Pitts' hostile work environment claim is primarily based on a theory of retaliation: she alleges that she was subjected to a hostile work environment as a result of complaints with the EEOC, MCCR, and IAD.[16] Pitts has not adduced any evidence indicating that her 2020 termination was related to the hostile work environment which culminated in her April 2018 medical leave. The individuals involved in her termination (Amey and Rhoden) are not the same people she alleges discriminated against her between 2014 and 2018 (Norris, Matthews, Giantris, Yerg,

---

[16] Pitts additionally references discrimination on the basis of her race and sex, but the focus of her action is a retaliatory hostile work environment. Further, she indicated on her 2021 EEOC charge that she was being discriminated against based on retaliation, and did not check the boxes indicating discrimination based on race or sex. (Def.'s Mot. Summ. J., Ex. 5, at 2, ECF No. 50-6).

Callaghan, Hill, Batts, and Gibson). Further, the employment actions alleged to have occurred between 2014 and 2018 are not the same types of employment actions which took place in 2020. Pitts alleges that between 2014 and 2018 she was subject to restrictions of her supervisory duties, fabricated disciplinary actions, depletion of her vacation leave, and improper detailing outside of the EEO office. By contrast, she contends that in 2020, she was denied the chance to return from medical leave and terminated despite having submitted her retirement paperwork. The actions additionally occurred years apart. These circumstances vary substantially from *Morgan*, where "the pre- and post-limitations period incidents involve[d] the same type of employment actions, occurred relatively frequently, and were perpetrated by the same managers." *Morgan*, 526 U.S. at 120-21; *see also Gilliam*, 474 F.3d 134, 141 ("Because [plaintiff] testified that [plaintiff's supervisor] reprimanded her several times prior to the limitations period for deficiencies similar to those involved [within the limitations period], each of these Acts may reasonably be deemed to have been a continuing part of the discrimination [plaintiff's supervisor] carried out against [plaintiff].").

Importantly, Pitts provides no evidence demonstrating that Rhoden possessed any knowledge of her prior EEOC charges and IAD complaint.[17] She testified clearly in her deposition that she does not know whether Rhoden was aware of her complaints. (ECF No. 50-2 at 125 ("Q: Okay, but they – how do you know that Major Rhoden knew about your prior EEO complaint? A: I don't. I don't.").[18] Such evidence is critical to establishing that Pitts' 2020 termination is a

---

[17] Pitts does not allege that Amey engaged in any misconduct. She also does not contend that Amey was aware of her EEOC, MCCR, or IAD complaints.

[18] Pitts speculates that Rhoden may have been motivated to retaliate against her because he was a former member of BPD's Gun Trace Task Force, and that because "their previous members were found guilty of EEOC" they may "have taken it upon theirselves [sic] to have some sort of retribution, retaliation[.]" (ECF No. 50-2 at 125). This contention is not, however, connected to Pitts' claim for a retaliatory hostile work environment based upon a protected activity—filing EEOC and IAD complaints.

continuation of the retaliatory hostile work environment she alleges existed between 2014 and 2018. *Compare Patterson v. Cnty. of Oneida*, 375 F.3d 206, 220 (2d Cir. 2004) (upholding dismissal of plaintiff's Title VII hostile work environment claim where plaintiff "proffered no evidence to show that the termination," which was the only relevant event alleged within the limitations period, "even if discriminatory, was in furtherance of the alleged practice of racial harassment.").[19]

Based on the record before the Court, there is no genuine issue of material fact regarding whether Pitts' 2020 termination was a continuation of the pattern of hostile and discriminatory conduct she alleges occurred from 2014 to 2018. The situations involve different actors, different BPD departments, and different kinds of employer conduct. Pitts has not produced evidence demonstrating that the individuals involved in her termination had knowledge of her prior EEOC, MCCR, or IAD complaints, as would be necessary to demonstrate the termination was part of an "ongoing pattern of discrimination" in response to her engaging in a protected activity. *Angelini*, 464 F. Supp. 3d at 787. Accordingly, the continuing violation doctrine is inapplicable in this matter, and Pitts' hostile work environment claim must be dismissed as a matter of law.

---

[19] The Court notes that Pitts asserts she received a phone call from Detective Sergeant Freda Arrington to arrange a phone interview because Amey filed an EEO complaint against Rhoden in reference to Pitts' case. (Pl.'s Opp'n to Def.'s Mot. Summ. J., Ex. 2, ECF No. 69-5). No further information is provided regarding Amey's purported EEO complaint. Further, Pitts' statements regarding what she was told by Arrington constitute inadmissible hearsay which "cannot be considered in the summary judgment context." *Ortiz v. Balt. Police Dep't*, No. SAG-22-1396, 2024 WL 4287999, at *4 (D. Md. Sept. 25, 2024).

**IV.    CONCLUSION**

For the foregoing reasons, Defendant's Motion for Summary Judgment (ECF No. 50) is hereby GRANTED. The Clerk is directed to close this case.

Dated: January 2, 2025
                                                    /s/
                                         _____
                                         J. Mark Coulson
                                         United States Magistrate Judge